We'll call the case of Consul Tree Communications versus the FCC. I'm Dennis Corbett. I'm here today representing Petitioners, Consul Tree Investors, Inc., Bethel Native Corporation, and the Minority Media and Telecommunications Council. I would like to reserve five minutes of my time for rebuttal. That request will be granted. Just one housekeeping matter, well maybe two. As I recited the names, the name of the lead petitioner has changed from Consul Tree Communications Inc. to Consul Tree Investors Inc. That's a recent change and we'll submit a letter to the court making that clear. Nothing else has changed about the company other than its name remains a continuous Delaware corporation. The second, I've had time to sit and I do notice one of your lights is out. A lot of lights up there. Sorry. That's the other housekeeping matter. I wondered why it was so dark. I'm back for the third time in this case, arguing this, and once before Judge Hardeman but obviously not before Judges Fischer and Stapleton and I appreciate very much the opportunity to be here again. It's a very important case. It's a very important case for the Administrative Procedure Act and for Section 309J of the Communications Act. It has a lot to do with the fidelity of an administrative agency in Washington and the importance of it following the law by which it is governed. I'm prepared to address for you this afternoon the merits, remedy, and the jurisdictional element of the remedy. There's a challenge to the jurisdictional component on the remedy side this time. I'd like to start with the merits but I'd be happy to go with what you want. I don't want to monopolize your time but there's so much going on here I want to make sure I understand it all. The first question is, Auction 73 is before the D.C. Circuit. Shouldn't we just stick with the facial challenge to the rulemaking process here and let the D.C. Circuit deal specifically with the issues raised peculiar to Auction 73? No, Your Honor. The D.C. Circuit case is no longer alive. We said in our brief, and I have to correct the record to that extent, it was a 20HA letter that said we will appeal but we did not. So it's no longer before the D.C. Circuit. They issued a non-precedential opinion unpublished. So our argument as to 73 very much hinges on the fact that the orders before this Court, which is the mother of all the orders in this matter, the second report and order, as reconsidered twice by the agency, within the confines of that order, the FCC expressly made the new rules applicable to Auction 66 and all subsequent auctions. So it is our position that this Court has everything it needs to reach the very auctions which were reached in turn by the orders that you have on direct review here. The D.C. Circuit, as we said, was a, I mean, we tried to turn over every rock, jurisdictional and otherwise in this case, to get relief, and that was an effort to just follow another procedural pathway. But in our view, in no way does it deprive this Court of jurisdiction to reach Auction 73. In fact, we think it would be a large mistake for this Court to agree in any way not to take this, not to agree that the scope of its remedial power is somehow limited when you have the mother of all the orders in front of you. So with that, going back to, obviously, as you say, there's an awful lot in this case, but I think it's very important to go back a little bit, go back in time to when this all happened, I mean, on the merits that is so critical to understanding the egregious nature of what the agency did here, the harm and the violation of the APA in the first instance, that they have a 309J obligation to promote small businesses' participation in auctions, to avoid excessive concentration of licenses. They have been implementing that statute for some time, a period of roughly 10 years prior to this auction coming up, and they had adopted a number of effective, quite effective methodologies for doing that. By the time of this case, it had all been boiled down to bid credits. But in 2003, for this auction 66, they had effectively left the five-year hold rule in place. So it was the investors and the parties who have to order their affairs knew what the rules of the road were going into the auction. In September of 2004, the Commission had released a comprehensive order on leasing of spectrum secondary markets, a decision which is a very important decision, which was a comprehensive rulemaking in which they set the rules of the road for the leasing part of it. And by the way, expressly declined an invitation to go beyond leasing into wholesale and other kinds of models in that proceeding. So the rules of the road were set. But then we reach February of 2006, really on the doorstep in the real world of these auctions. After investors had been planning to participate in this massive auction 66, on the doorstep of the auction, the Commission releases the further notice of proposed rulemaking. And given the... In response to your client's initiative. That's true. That's true. Care for what you wish for. You were wishing for something quite different. We certainly were, Your Honor. We never, ever, ever asked for what came out of this rulemaking. We asked for what we thought was a reasonable change to a DE program that was working well. The one thing we asked for was to try to limit the involvement of the large companies in this DE program. We'd asked for that back in June of 2005. The Commission didn't get around to putting it out for public notice until really it was very, very late. That was February of 2006. I cannot account for that delay, but it was a significant delay. And it meant that this rulemaking was coming so close to auction 66 that it was perilous to do anything, to make any changes. And a lot of the record before you reflects that. A lot of the comments that came in response to that February notice talk about, there's not enough time. And you were concerned about these material relationships, correct? Well, with respect to the large, only the, only the largest incumbent carriers within region, yes. All right. Then that leads me right to, I think, two of the three issues, which are the 25 percent rule and the 50 percent rule. Seems to me there's a great distinction between the two because the 25 percent rule seems to directly address this concern about the opportunity for DEs to flip spectrum to a whereas the 50 percent rule, I don't understand, and I'll ask your adversary, isn't there a distinction there because you could piece together a lot of small DEs and still run afoul of the 50 percent rule, which would seem to be contrary to the mandate of the statute. But with respect to the 25 percent rule, isn't that right in the heartland of the statute? No. I disagree, Your Honor. I think the problem with even trying to figure that out is there is no record. I can give you my own opinion about it, but there is no record on which you can make an analysis of whether the 25 percent rule makes any sense at all because it was not proposed by the agency. It was not commented by stakeholders. The 25 percent rule, for example, it works a real harm with wire-free partners, one of the amicus. One difference today from our last case is that I am supported by amici, six DEs and 10 public interest groups. One of them, wire-free, made clear to the court that its model for trying to succeed in this very difficult business, remember, if you're going to try to challenge these large incumbents with all their advantages, you need to find big dollars. You need to have some sort of business plan that will actually work to bring new competition to them. Wire-free's model, as they explained, was to have a 50 percent arrangement with one entity, one major financer, one major party in their business model and not part of the control group, but they wanted to be able to lease spectrum to 50 percent. Well, the 25 percent rule precludes that. I'm sorry, the 50 percent, yeah, the 25 percent rule precludes that because it says you can't have a 50 percent deal with one party. There is no rational basis that I know of to say that 25 percent is a good rule. But the bottom line point is this record is so deficient, it's so bad, that this court as a reviewing court has nothing to look at as to whether it's a good idea or a bad idea. It wasn't proposed. It wasn't commented on. And that's the huge problem with this case, Your Honors. It's just a gigantic problem. Your normal function is to look at a notice that sets out reasonably what the agency plans to do. Then you're normally, you decide what the, you look at the comments that were followed in response to that, and then ultimately what the agency decided to do. But in this case, you cannot do any of those things because the 25 percent rule wasn't out for comment, the 50 percent rule wasn't out for comment, the 10-year rule. Do they have to affix the actual percent? I thought they specifically noticed that we're looking at how much, you know, they didn't throw the number 25, but they talked about the concept of how much someone should be allowed to pass off on another entity. Yes, in the notice, pass off with either large incumbent wireless companies or other large companies with significant communications interests. What they ultimately adopted was an across-the-board 25 percent limitation, no matter the size of the party you sell the 25 percent to. Very, very different rule, much more all-encompassing than anything they proposed. That's a critical difference. Remember, the notice, if you read it, and I've read it so many times now over these three and a half years, it's remarkable how targeted it is. It's targeted at two specific proposals. Now, on the other side, they picket snippets of language like such as and additional entities, but from a real-world practical perspective, no commenter can reasonably read that notice and realize they were thinking about a 25 percent rule or a 50 percent rule. They were talking about keeping, regardless of percentage, keeping the large incumbents out of this business of DEs, but they did something entirely different that went across-the-board to all DEs. So, it's a very different rule. We're going to add an additional five minutes on your clock, if you would like it. For now, I would certainly take that, yes, including my rebuttals. You want it now? We're going to add an additional five minutes. Thank you very much. I appreciate that a lot. So I think that the bottom line, I'm staying with the APA for just a moment because I think that one of the most important things this reviewing court has got to do in order to assure that the rule of law applies in this country is to make sure that when the agencies are going-they're entrusted with a lot of power. They have a lot of power to affect a lot of people. In this case, the designated entity community, the robustness of competition in these spectrum options. Tell me, Mr. Corbett. Yes. And you're talking a lot of generalities here. When you get right down to this, how much more specific did the agency have to be in the further notice in order to put the interested parties on notice as to the rules that they ultimately adopted in the second order? I think they needed to have basically an entirely different approach to this proceeding. They needed to put the public on notice that they were considering revisiting the DE rules in general. In a general sense, didn't the further notice state that? No. No, Your Honor, it did not. It immediately went from the first paragraph through to the end of the notice talking about taking the council tree proposal, putting it out for comment. It was a very specific proposal and it was described with fidelity by the agency. And of course, if you look at all of the comments that came in, they all focused on those targeted issues. I would even commend you to the Department of Justice comments. I mean, they came in with comments in this proceeding, but they summarized the scope of the notice. And when they summarized the scope, they talked about how focused it was on large company involvement in the DE program. But they're here today defending the rules with the FCC, the United States is, but at the time when they commented, they didn't even see how the scope could go beyond the large company involvement. That was what the commission teed up for comment. What about the fact that over half of the winners were DEs? I know you're sort of ships passing in the night. They say, hey, look, and they have DE amici, right? I understand. And they say, over half the winners were DEs, and you come back and say, well, wait a minute. It's only 4% of the total pie. In option 66. Right. Dropped 2.6% in 73. Right. I guess the question I have is, wouldn't one expect that result? In other words, if the DEs are the little guys, the rural, the minority-owned businesses, the small businesses that the SBA weighed in on your behalf, wouldn't one expect that those entities would win a lot of licenses that involve a small region? Because how in the world could they handle a huge swath of Southern California if they're one of the little guys? I guess that question. Easily, Your Honor. And in fact, if you look at the past, the point is we've submitted to the court in the record, in the supplemental record, charts detailing the performance of DEs in prior proceedings, in prior auctions, and how they had obtained on a value basis as much as an average of 70% in the six critical auctions. The point is, what they say in response to that is, well, DEs were able to partner with the large incumbents. Right. Right. But not just the large incumbents. Even when you subtract those, they did much better in those prior auctions. Well, but there were also set-asides in those auctions, too. There were, because the Commission was much more faithful to the statutory mandate to ensure that there would be an opportunity to participate in these auctions by small businesses. And so a small business can have a large business plan. Remember, the statute, which is all about DEs, one of the objectives the Commission is charged with implementing is to avoid excessive concentration of licenses. Well, the only way- But it's also avoid unjust enrichment. True. And they had a- There's no benefit, it seems, under the statute to allow a DE to win a license and then just turn around and flip it to a group of venture capitalists or to somebody else. That's not what the DE program is intended to do, is it? Nor did the rules permit them to so flip them to large companies. There was a five-year hold rule. There was no demonstration that that was inadequate to protect that very interest and the unjust enrichment. There's no showing on this record that that was ineffective to satisfy the unjust enrichment part of the statute. You know, the Commission has argued twice now in front of this Court that they have this difficult job of balancing these competing objectives in the statute. Well, in my opinion, that only emphasizes, if it's so complicated, it's not so complicated, they have to compete, you know, balance competing interests, that only emphasizes how important it is to put out a plan like this for public comment, to help them with the complexity of this rule. They shouldn't be making these balancing decisions in the dark, uninformed by the comments of stakeholders. If they had only let people know that they were even contemplating something like the 50% rule or the 10-year hold rule, then they would have gotten the informed comment to say just how bad an idea that was and how much it would cripple their access to capital. That is the lifeblood, the oxygen, as Judge Rendell said back in the state part of this proceeding. It's clear, without the money, none of this happens. And if you start to cut off the investors with irrationally adopted, unsupported in the record rules, which are demonstrably irrational and harmful, then you are risking the very auction statute you're charged with implementing. In addition to violating the APA by conducting this rulemaking in such a harmful way, you're also adopting rules that are irrational and don't have a good basis in fact and are harmful to the DE community. Just let me end on your time. And I'm red again. I am red again. I appreciate the time. With respect to the 10-year hold rule and your argument about inadequate notice, they say, well, we did in our notice talk about unjust enrichment and ask for comments over what portion of the license term should unjust enrichment provisions apply. And they point out that one of the petitioning parties here, MMTC, they say recommended 10 years in response to that. Well, I understand, Your Honor. First of all, Well, what's your response to that response? Two. Two. With respect to the first one, the quote you gave from the notice says, pursuant to any eligibility restriction we might adopt, okay, so you have to read it in context over what term should it apply. So they were, again, within the confines of this targeted proposal of the rules that they were proposing to exclude DEs. They say, well, they say it would have been irrational for us to adopt different standards, but they didn't put that in the notice. The notice language is limited to any restriction they might adopt. As to MMTC, first, MMTC only said that the Commission should consider a new proceeding or a further inquiry to consider whether to extend the period. They didn't say that the Commission had any basis in this record for doing so. In fact, they acknowledged it would need a new notice. And secondly, at 1317 of the JA, you'll see that MMTC submitted a clarifying declaration to say, not so fast, we in no way can be held to have proposed that you should adopt at this point on the doorstep of option 66, such a rule out of the blue. That was, we were talking about down the road and a further inquiry, and that's all we said. And that's the lone comment they have to support this in an entire record, such an important rule, and that's it. Our own, my own petition, my own client's comment that says you should consider another inquiry. That's it. All right, Mr. Corbett, we'll have you back on rebuttal. Thank you very much. Mr. Palmore, and we did give Mr. Corbett an additional five minutes, so if either of you need some additional time. Thank you, Your Honor. All right. Let me start out, let's start out on jurisdiction. Now, as I understand it, you acknowledge that we have jurisdiction to review the second R&O based on the petition that was filed April 8 of 2008. Correct. Following the second reconsideration order. Now, normally a court has jurisdiction, if it has jurisdiction over the suit, over the subject matter of the suit, it has jurisdiction, subject, of course, to equitable considerations to decide what remedy is, should be afforded in the event that the party petitioning demonstrates merit to its position. Now, as I understand your position is that we are, have no jurisdiction, whatever, to consider whether auction 66 or 73 should be rescinded. That's correct, Your Honor. What is it that deprives us of the jurisdiction we would, at least I would normally think we had? Because there's a difference between an agency's adoption of a generally applicable rule and then the separate application of that generally applicable rule in particular proceedings. So, there's no question that now that the jurisdictional defect that the court identified previously has been cured, that the court has jurisdiction over the generally applicable rule, the rulemaking orders. We can see that. But the application, the separate application of that generally applicable rule in separate proceedings over the last three and a half years is a separate matter. And to the extent that a party wants to challenge the particular application in a particular proceeding, it's incumbent upon that party to challenge an actual order in one of those proceedings. Counsel Tree has actually attempted to do that here by identifying a public notice. But that challenge is untimely. And what do you cite for that proposition? Well, we cite the Beam case from the Supreme Court and Harper v. Virginia, Virginia Department of Taxation. And what those cases say is that when it's an analogous situation, when the Supreme Court adopts a new principle of law, that principle is applicable to all cases on direct review, but that things like the statute of limitations, law of the case, can nonetheless bar application of that new principle of law in any particular case. So it's somewhat, it's not directly on point, but we think the principle is the same. And Mr. Nektarline also intends to address some of these remedial questions that are presented here. Go ahead. Okay. Thank you. But isn't, wouldn't your, wouldn't your question, wouldn't your position on jurisdiction be correct if they were challenging the actual auction notices? I think if they challenged an actual auction notice that embodied a decision to apply these rules to a particular auction, then yes. Yeah, I could see that there would be a valid jurisdictional question about the untimeliness of those challenges. But here, aren't they challenging in a timely fashion the actual rules? The actual rules. But separate proceedings took place with their own orders, and licenses actually granted under those separate proceedings. So to the extent they wanted to undo one of those separate proceedings or challenge one of those separate proceedings, they needed to file a challenge in one of those separate proceedings. They've actually attempted to do that twice. They've attempted to do it here with respect to 66. So are you saying we could find these rules were flawed, but we couldn't overturn the auctions? I am suggesting that. I think there are very powerful equitable arguments also for not, which are even more we do maintain those jurisdictions. That's your position. Exactly, Your Honor. Yes. From the beginning of the Designated Entity Program, the Commission's endeavor to strike a balance between providing opportunities to small businesses to participate in the provision of spectrum-based services, while at the same time ensuring that those opportunities only go to bona fide small businesses. Around 2005 and 2006, there was a general sense that that balance had become unbalanced, that the DE program was being abused by larger corporate entities and by designated entities who had no, who weren't planning to actually provide facilities-based competition for the long haul to the public. Council Tree in particular complained about abuses of the DE program. And Council Tree had a very specific proposal for how to address those abuses. And the Commission took elements of that proposal and put it out for comment to start a proceeding to determine how it should tighten its DE rules to ensure that only bona fide small businesses were able to take advantage of these very valuable bidding credits. In conducting that inquiry, the Commission was applying, as Mr. Corbett said, Section 309J of the Communications Act. The Communications Act is a very complex statute, and that's arguably the most complex part of the Communications Act. It requires the Commission to look at and weigh numerous competing factors and sub-factors in fashioning its auction rules, and in this case, in structuring its designated entity program. It's clear that nothing in Section 309J guarantees any level of success by designated entities. It's clear that nothing in Section 309J favors or disfavors any particular small business's business plan. And in fashioning these rules, what the Commission was trying to do was ensure that the program was conformed to the purposes of the program. And with respect to the two rule changes that are at issue here, the first is the one that the parties have called the lease resale restrictions. There the Commission reasonably concluded that if a small business was going to get this incredibly valuable resource at a steep discount, the spectrum, that it was reasonable to require that small business to actually use a majority of that spectrum to provide actual service to actual customers, not to simply hand over that spectrum or most of it to some other entity to provide service to that other entity's customers. Second, with respect to unjust enrichment, the Commission concluded that unjust enrichment rules should be strengthened in order to provide incentives for designated entities to be in the business for the long haul. Under the prior rule, the prior five-year rule, a designated entity could, again, get this very valuable public resource at a steep discount, hold it for only five years, and then flip that license or those licenses at a market rate without ever having actually provided any service to anybody. What the Commission recognized was that the unjust enrichment rules in the DE program represents a quid pro quo. The public is giving something, which is a bidding discount, which is very valuable, and in return it expects something back. It expects the creation or the expansion of a real facilities-based carrier that's actually going to provide real service to real customers. All right. But it doesn't say provide retail service. So I'm having trouble understanding the rationality behind the 50 percent rule, which prohibits wholesaling by a whole bunch of DEs. Your Honor, this is a complex and ambiguous statute, and I think the Commission's reading of it to favor retail service under at least a portion of the spectrum is certainly reasonable. I'm not going to suggest that it's compelled by the statute, but what the Commission said in the reconsideration order, I believe it's footnote eight, was that it construed the word participate, participate in the provision of spectrum-based services to represent a congressional, to favor actual retail service to actual customers. And there's actually legislative history that was cited in the reconsideration order and then also in the secondary markets order that Mr. Corbett referred to that cites that legislative history. But shouldn't the interested parties have had an opportunity to comment and give the Commission an opportunity to really study the distinction between retail and wholesale? I guess what I'm asking from a larger 30,000-foot view, the reason I asked Mr. Corbett as well is, isn't there an important distinction between a DE that after five years, as you say, flips it, just basically monetizes the privileged status of being a DE? Isn't that qualitatively different than a DE that participates in the provision of telecommunication services by partnering with a bunch of other entities? Well, I think your Honor's question to Mr. Corbett was quite right in that there is a distinction between the 25 percent rule and the 50 percent rule. The 50 percent rule is a prohibition, the 25 percent rule is an attribution rule. And they get at the same issue, but it's from slightly different directions. What the Commission wants is the DE that gets this valuable benefit to be making the key decisions about how service is provided and not have those decisions be made by someone else. So whether it's a pure lease of spectrum or whether it's a wholesale arrangement where, for instance, some large entity financed the construction of facilities which nominally remain titled to the DE, and then those facilities are in turn used through some kind of wholesale agreement. Well, it can't be an entity that's more than 25 percent, because then the attribution rule kicks in. That's right. I think that the – I mean, you're basically – if you combine the 25 percent and the 50 percent rule, as I understand it, if we assume for a minute the 25 percent rule is valid, how does the of things that don't seem to create any unjust enrichment, at least as far as I can tell? Well, a couple answers to that, Your Honor. The 50 percent rule would still have impact because the DE could, for instance, partner with one large entity for 24 percent, another large entity for 24 percent, and not have any attribution and not run afoul of this 25 percent rule, but then it would have to stop there. It would have to, using half the service, actually provide real service to its own real entity's customers. To the extent the issue is, well, what's the harm in leasing to another DE, I point out by starting by – I would start by saying that's, I think, somewhat of a theoretical concern, because I don't think that's, in the real world, what happens here. But I think what the Commission is looking at is that the entity that gets the benefit and gets the license should be the one that, by and large, is providing service. Why didn't you say that? Pardon me? Why didn't you – that sounds like a perfectly logical, reasonable thing. Why didn't the Commission say this is what we're going to do, and let's put it out for notice and comment? What do you all think? Sure. I want to go to the notice comment, because I think that – the notice issue, because I think that is important. I think Mr. Corbett respectfully suggests he misstates the governing legal standard here, which is in Section 553b3 of the APA, where Congress required an agency to put out for comment either a proposed rule or the subjects and issues involved. And this Court's precedents are quite clear that it's the subject and issues test that governs. So the American Iron and Steel case that we cite in our brief, the Fertilizer Institute case, say that an agency is allowed to put out a rule and adopt a rule that's very different, even substantially different, in the words of the Court, as long as the subject and issues of concern to the agency were teed up in the notice of proposed rulemaking. And here, the subjects and issues that were teed up were operational relationships between DEs and other entities and the unjust enrichment period. And I'd like to go – Let me ask you a question, then. Sure. Your friend across the way said your notice was about one ballgame and your rules were about another. He says it's clear that Council Tree's recommendation and the supplementing recommendation that the commission came up with dealing with major companies providing communication services were all directed to the problems created by big players in the DE marketplace or in the DE program. And what you – what the commission wound up adopting was not limited at all to those problems, but were across the board to everybody whether there was a big player involved or not. What do you say to that? Well, I'd say I have a couple responses to that. First of all, paragraphs 6 and 7 of the NPRM talked in general about the purposes of the proceeding and the commission's ongoing effort to balance and to make sure that the program was available only to bona fide small businesses. With respect to the entity, so there were two – really two issues. What is the nature of the relationship that's of concern and with whom? So taking the with whom first, if you look at paragraph 19 of the Notice of Proposed Rulemaking, there the commission notes that Council Tree proposed to restrict relationships only with large incumbent wireless carriers. The commission said we're thinking about expanding that to entities with a significant interest in communications. That was a term of a phrase, as far as I know, that was – that had not – has not been used in commission orders before. It appears for the first time in this NPRM. But there in paragraph 19, the commission runs through, well, here are some of the entities we're thinking of adding to this restriction. And the commission then asks in a very open-ended way, what additional entities should we add? How broad should this definition be? In response to that query, there was comment after comment filed saying, you're being myopic in looking only at certain categories like large incumbent wireless carriers or entities – What about Google? What about Yahoo? What about Google? The issue is the relationship, not the identity of the entity sitting on the other side. So for instance, the Dobson Communications comments, I think at 525 of the Joint Appendix, are all about this issue. They say it doesn't make any sense to restrict this just to these two categories you've teed up. You need to – you should restrict this to any investor. In footnote 22 of our 2006 brief, we cite a number of other comments which were all to the same effect. Now, to be clear, some of those comments weren't saying we favor a restriction, but they say if you're going to adopt a restriction, it doesn't make sense to limit it in the way that Council Tree wants or the way that you've tentatively proposed to do. You should apply it more broadly. Then with respect to the nature of the agreement that's at issue, this is where we get to paragraph 16 of the NPRM. And here, the commission specifically talks about – my time is up. I have an additional five. Thank you. The commission explicitly talks about leasing. It talks about its secondary markets order, which was all about leasing, and expressed the commission's concern that leasing arrangements with DEs were subject to abuse and could be subject to abuse because they put another entity between the DE and the public. And then the commission goes on in that paragraph 16 to say, what other agreements should we look at other than leasing? In response to that open-ended request for comment, Council Tree itself said you should have a very broad scope. You should look at a whole host of agreements. They had three narrow carve-outs, I think interconnection, roaming, and short-term leasing. And they said every other agreement should be covered. And they explicitly include – cited to leasing and resale as examples of – leasing and those comments are cited in printout 54. Even if they got the ball rolling here, isn't it still incumbent upon the agency to provide notice and an opportunity to be heard? Where in this record was the aggregation aspect of the 50 percent rule noticed? So that interesting parties might comment on that. You mean in terms of where exactly the line would be drawn? Where is – I couldn't find aggregation at all. Well, I think it's important to recognize that what Council Tree wanted was a flat prohibition. No 50 percent, no 25 percent, a flat prohibition. Now to be clear, they didn't want it with any entity. They only wanted it with large incumbent wireless carriers, but that goes back to what I said before about how there are two different but related issues. What's the nature of the agreement that should be regulated and with whom? So Council Tree had its own answer to the with whom, and that was narrower than the commission ended up adopting. But it also had an opinion as to the nature of the agreement, which was much broader than what the commission ended up adopting. It wanted a flat prohibition on all kinds of agreements with three narrow carve-outs. So what the commission did was it drew a line. I'm not sure that's responsive to my concern. My concern is – you've persuasively argued how what the commission did was not – was a half measure as compared to what they requested, but you haven't pointed me to anywhere in the record where the community – any interested party in the community would have noticed and an opportunity to comment on the impact that the aggregation aspect of the 50 percent rule might have. Well, I think, Your Honor, again, I would say that that's somewhat of a theoretical issue because I don't think that the issue here is leasing really in the real world. It's leasing to other DEs, if that's what you're getting at. All right. So if it's – But I think in Paris – Well, let me just cut you off there then. Sure. If it's theoretical, let's assume for a minute that – well, if it's theoretical, then I take it the commission would have no problem with us issuing an order saying that the auctions stand regardless of whether it's jurisdictional or equity. The auctions stand, but yet this 50 percent rule is harmful because it impacts not only large incumbent carriers, but it also impairs the ability of DEs and smaller companies to aggregate. So we're going to find that to be arbitrary and explain, in essence, a reformation of that rule. If it – it sounds like you'd have no problem with that. No, I think you won't be surprised to hear that I would have a problem with that, Your Honor. I would. Then why is it just a theoretical – Okay. It's a – theoretical is perhaps not the best word. I mean, I think it's a prophylactic rule. I mean, what the commission's experience has been is that these relationships with over time. And this is talked about in the second report in order. There are ingenious lawyers who come up with arrangements to ensure – or to attempt to ensure technical compliance with the commission's rules, but that nonetheless in the real world and the substance allow some other entity to kind of control the spectrum. So I think what the concern would be would be that if the DE is leasing, wholesaling more than half – more than half of its spectrum to some other entity, even if it's another DE, then the commission has to look at that DE. Okay. Who is this DE? These are very laborious, intensive requirements. What are all their agreements? Who are their investors? Who controls that DE? And you go from there. It's a simple bright-line rule to simply say – and it's consistent with a reasonable reading of the statute, not only in this order but in the secondary markets proceeding to say that you should be in the business of providing actual service to actual customers with at least half the spectrum. The commission chose to preserve some flexibility here. Shouldn't we have comment and study as to whether wholesaling constitutes providing those services? Well, I think wholesaling by definition involves the DE allowing another entity to use the DE's spectrum, possibly the DE's facilities also, but to serve that other entity's customers. That's what resale is. So in that sense, it's really of a piece with leasing. It's really at the same – there are two different avenues to the same place, which is that the DE is allowing another entity to use that spectrum or those facilities to provide service to that other entity's customers. Now that other entity could bid and get the spectrum, and the taxpayers would get more money because if the other entity's not a DE, there would be no bidding discount. But it seems to me reasonable for the commission to expect that an entity that gets this very valuable bidding discount to actually use it to provide service to the public. At the very least, it's a reasonable reading of the statute. It's a reasonable reading of the word participate in the statute in terms of participation in the provision of spectrum-based services, and it has support in the legislative history that the commission provided. Okay, Mr. Palmore.  Let me ask just one question, please, sir. You may. You ask that if we should consider that there is a problem with what the FCC has done. You of course ask that we not try to rescind the auctions. But you also say that the remedy should be a remand with no vacater. Yes. Help me, I'm not really familiar with that form of remedy, but it seems like unless it has some qualifications, it seems like no remedy at all. I mean, we're talking about a situation, presumably we're talking about a situation where the And there's some merit to saying, well, let's not have a change of – another change of the law in the interim. And I guess my bottom line is, is there any authority for a non-vacator with a time limit? That is, give the commission nine months to consider corrective action, not invalidate the rule for the interim period, but require reconsideration if the commission is going to do it within a limited period. I think there is. I think one of this Court's opinions, and I'm blanking on which one it is, whether it was the American Iron and Steel case or the Fertilizer Institute case, or perhaps the public citizen health research case from earlier this year, said – included language that we expect the agency to move expeditiously on remand. I don't know that a specific deadline was given. But this Court has employed the remand without vacateur remedy on a number of occasions, as I said, in the American Iron and Steel case that we cited in our brief, and this recent public citizen versus health research case, F-557, F-3165, from earlier this year. And the Court has, in this latter decision, cited to align a D.C. Circuit authority, which really developed this concept. And what the D.C. Circuit has said in those cases – the Allied Signal case was the first one – was that in deciding whether to remand without vacateur is proper, you look at two and you look at how disruptive vacateur would be. On the first point, the courts have consistently held that notice issues – APA notice violations, or even failures to explain or failures to provide any kind of rational explanation for a rule – are proper candidates for a remand without vacateur, so long as it's possible that the agency could adopt the same rules on remand, deploying proper procedure. And I would suggest that that standard is easily met here. And then the second prong is disruption, and I would suggest that there would be – even putting aside the issue of the auctions – there would be disruption to vacateur of these rules, because then that would really only affect, I believe, the designated entities who actually got spectrum in these auctions, so not counsel tree. The designated entities who went into these auctions knowing what the rules were – bid, got spectrum – then it's possible that a vacateur then would relieve them of these rule tightenings. But then if the Commission were to adopt the same rules again, then there would be retroactivity questions. It would be tremendously disruptive. So I think this would be – I don't think there's any error here or any remand is required, but to the extent the Court disagrees, I think this would be a very strong candidate for remand without vacateur. Okay. Thank you, Mr. Goldmore. Mr. Nechterlein? How close was that? It's Nechterlein, Your Honor. Nechterlein, yes. May it please the Court, I am John Nechterlein for intervener T-Mobile. We support the FCC's defense of the orders the Commission issued in the general rulemaking proceeding at issue here. I'm here today to argue that no matter what this Court decides about the validity of those general rules, it should leave intact the subsequent outcomes in the FCC's separate auction proceedings. There are two reasons for that. One is jurisdictional. One is equitable. Mr. Palmore has already touched on the jurisdictional one. I'd like to address the equitable one first because there have been additional developments since we filed our most recent brief in this case. Because of Counsel Tree's procedural default in the 2006 appeal, three and a half years have now elapsed since this Court denied Counsel Tree's request for stay of the AWS auction. That's an eternity in this fast-moving marketplace. After spending billions of dollars to build out its AWS-compatible networks, T-Mobile now uses the spectrum it won in Auction 66 to serve millions of Americans in 240 cities throughout the United States. And as detailed in the amicus brief supporting the FCC in this round, other carriers are likewise using the auction that they won to provide service to thousands of their own  In fact, MetroPCS, LEAP, and T-Mobile are all using the spectrum they won in this auction to provide wireless broadband services to many subscribers here in Philadelphia. Did T-Mobile start as a DE? T-Mobile won – T-Mobile was a successor in interest to DEs, but there were other companies in the mix as well. But T-Mobile has some experience – its predecessor in interest has experience with the DE program? Correct. Why don't you tell us what your client's position is then about this notion that the issues here – the rules have been devastating to the DE community? I don't think they have been devastating to the DE community at all. They have been devastating to particular business plans within the DE community. And what are those? Those are the business plans in which DEs get a discount for spectrum and then use that spectrum for the benefit of carriers that would not themselves be eligible for DE discounts. So it's an end-run-around – That is one concern. Parties don't need to pay full – parties can get spectrum without paying full freight. Correct. There are a myriad of arbitrage opportunities here. Mr. Palmore is quite correct that the FCC has broad discretion to design prophylactic rules to avoid arbitrage situations. Any judicial order throwing out the auction outcomes or even casting them into doubt could have devastating consequences for the wireless marketplace. And I'd like to distinguish between – I see my red light is on. If I could have a couple of minutes. In the shorter term, vacater – You're going to have to until we cut you off. Okay. Vacater of the auction results would cause millions of Americans for T-Mobile and other carriers that have AWS spectrum to face degradation or loss of their wireless service, and it would make their handsets useless for the 3G wireless broadband services that these handsets were designed and sold for. It would also strand billions of dollars in network build-out expenses that auction winners used. It would cause the spectrum to lie fallow for years while regulatory and legal proceedings spun out of it. It would compel the federal treasury to refund the billions and billions of dollars the carriers have already spent at auction for the spectrum, and it would also force the federal government to tap into new sources of federal revenue to fund the remaining spectrum relocation initiatives that have been funded by these auction proceeds. I'd like to spend 20 seconds on the long-term consequence that I fear. If this court were to issue a judicial order three and a half years after the fact suggesting that these auction outcomes were in peril, it could subvert the integrity of the auction system itself to the detriment of consumers and the public fisc. That is because carriers and investors will not risk billions of dollars to obtain spectrum and build-out networks. If they must worry, the run-of-the-mill APA challenges can cause auction results to be nullified many years after the fact. After auction licenses have been awarded, networks have been built, and millions of customers are being served using the awarded spectrum. That scenario where an auction – there has never been a case where a court has invalidated auction results after licenses have been issued, billions of dollars have been spent on a build-out, and millions of customers have been served. Thank you. Thank you, Mr. Nichterlein. Mr. Corbett for rebuttal. Thank you, Your Honor. A lot of important things to address. Let me start with wholesaling, which I think Judge Hardiman has directed a number of questions to. Wholesaling is a perfectly viable model to avoid excessive concentration of control. I mean, the benefits of it are manifest. What happens is a DE bids at auction for the spectrum, obtains the spectrum, builds out the facilities. Right there, you've got a pro-competitive benefit. Once the facilities are constructed, if they're then sold on a wholesale basis by the DE who remains in control of the enterprise to these other companies, which can then provide the much-needed competition to the big companies – there are only four of them now. When this case started, there were six. We're down to four. So if by wholesaling, you can provide new facilities, which in turn translate into pro-competitive competition to those companies, then the public interest is served, as is the public. So the wholesaling model has been disrespected, but that gets me to the larger point here. There's a certain surreality to what we're doing here, and I think we have to recognize that. That is, we're trying to figure out, wholesaling, is it good, is it bad, is it indifferent? And we can't – you don't have the records you need to review it. Going to Judge Hardiman's questions about if you put it out for notice, if you'd gotten the robust comment from the stakeholders who know this model and know the benefits it can provide, then this Court would be in position to review a record. But you don't even have it, so we're almost conducting a rulemaking here by these arguments. We don't have the record. The record – Well, opposing counsel said it was leasing, but I note, if my review of the record is correct, there was extensive discussion in 2003 regarding leasing. 2004, yes. In fact, there was – It seemed to be quite distinct from what we saw here. It was. That was the secondary markets proceeding I referenced earlier in my argument. And that's the one where they took a much more restrained and appropriate approach to rulemaking. That's where they put out comments about just how leasing should be regulated, and they came out with the decision. But remember, in paragraph 84 of that very decision, they expressly refused to go beyond the leasing which had been put out for notice and comment. What they said was, anything beyond that has too sparse a record. At least it has some record, but it's too sparse. Because why? Because we could end up with unintended consequences and ambiguities if we start to stray too far afield from the record and what we've been informed about. In this case, they went the opposite way. So I want to also talk about Vocator. I couldn't disagree more strongly with counsel on the other side. This is a terrible case for remanding without Vocator, and it would be no relief at all. We'd be back with the agency who's obviously given you nothing to hold onto for these rules. They don't deserve another day in the sun. They need to be put out of their misery by this court. They continue to work harm. No matter what you say about looking backwards and how far your remedial reach goes into the past, at least if you vacate the rules going forward, they won't infect and contaminate another auction, which is what's happening. Remember, there's a long lead time for planning for these auctions, and as long as these rules are on the books, the planning process is invaded. Couldn't the agency be given time to propose how they would deal with future auctions rather than vacating the two auctions in question here? It would be. Look, first of all, I would say that would be a very bad idea for the reasons I gave before. You could do that. That's within your remedial power. But I'd say it's a very... Why would that be so bad? Well, let me go back. Let me amend my answer. Excuse me. I should say that there's a threshold statutory question in 706 of the APA, which talks about the fact that you must hold rules that are arbitrary and capricious are to be unlawful and set aside. So you have, first of all, to get around the statutory issue, which says that if it's unlawful, you set them aside. Even though you didn't challenge the auction notices in a timely fashion. Well, we did challenge... That gets us into... The order that is before this court, as I call it the mother order, on its face says that these new rules shall apply to auction 66. That is, in fact, the very order that applies these rules to auction 66 on its face. In addition, it says, and to all subsequent auctions. So we have the very best order you could have to challenge, certainly, auction 66. Because remember, auction 66 generic rules, the service rules, have been established before this rulemaking. This rulemaking was done so close to the auction itself that that's why they had to say these rules shall apply to auction 66. So you have an order before you that applies the rules to a specific auction, 66, and all subsequent auctions. Now, in addition, we've appealed a public notice that we believe is ancillary to the three orders, and that public notice was relating exclusively to 66. But for this court, it's a very odd argument to say that you should... It's only an order that exclusively relates to an auction that vests this court with jurisdiction. When, in fact, the order before you clearly does apply to the auction, and it's even more general in terms of its scope. So it's actually a better order than a simple little procedural order that our public notice that applies to an auction. You've got exactly what you need to reach the auction on its face. My light's on again. I did... This Dobson... One thing about Dobson, it keeps coming up, that is an evidence of how broadly the commenting public... Somehow, Dobson is a talisman for getting broad comment. Well, Dobson's comments, and he gave you the site as 525 in the joint appendix, was all about large entities. All they said was, in their conclusion, if it is to make changes in the DE rules, to apply those changes to all large entities. Again, it didn't go to all investors and all DEs. They were talking, taking the Commission's invitation about large entities. What would you like? Am I finished? You're finished. Thank you. Thank you. I really appreciate your time. Thank you. We would... We asked for a transcript. We... Yeah, we will. We would also ask Judge Hardeman. Counsel for the Commission would answer one question. You can stay or... Come on up to the microphone. Sure. We want to make sure we get it on the transcript, which we're going to ask both of you to jointly get ordered and submitted for the Court. Make arrangements for a transcript of this argument. Oh, we will work together on that, Your Honor. You'll do that. Following up on Judge Stapleton's question about a vocator, if we were to vacate one or two of these three rules at issue, the Commission then just goes back to the drawing board, I assume. It could go through with notice and comment and impose the same rules again or perhaps slightly different or... Can you enlighten me about what would happen if we vacated one or two of these? Sure. I think the Commission... It would depend on the basis for the vocator. So if the Court were to say that these rules were in excess of the Commission's statutory authority, then I don't think the Commission could re-adopt them. I would suggest that the statutory argument is not very strong here. Let's say it was arbitrary and capricious. Let's say we concluded that this was done in... It was very important. It was done in tremendous haste, and there was not adequate... Notice. Notice. Well, I think that the cases that we cited in our brief suggest that even when there's a failure of notice, even if there's a complete failure of notice, that a remand without vocator is the proper remedy. If there was a vocator of one or two of these rules... All right. Well, I'm sorry. Now I need to cut you off on that. Okay. I don't understand that at all because if it's an invalid rule, why would we leave it in place? Well, because it's a... Because under the Allied Signal decision from the D.C. Circuit and all the following decisions from the D.C. Circuit, which have been cited and adopted by this Court, the Courts are loath to vacate a rule that an agency believes is in the public interest for if there's a procedural violation that could be cured. So if there's a notice problem, what the Commission could do if there was a remand without vocator is provide a supplemental notice of proposed rulemaking, receive comments, and then it could decide whether to re-adopt this rule or to do something different. And as long as the Court is convinced that it's possible that the Court could re-adopt this rule, then a remand without vocator is the proper approach, and I would suggest there's some good evidence before you that it is quite possible in the reconsideration order, the Commission adhered to these rules despite the arguments that Council Tree made at the time and the arguments that some designated entities made at the time. The other thing you look at, as I mentioned before, is the disruption. Because what the Courts want to avoid is the disruption that would be created by kind of erasing a rule and then having it reappear, spring back to life, you know, a year later, which could happen if there was a vocator. Well, that's an evil, but that might be a lesser evil than having the Commission go on its merry way and continue doing business under rules that we've held are invalid. Well, there would be, if there's a remand, there's an obligation to respond to that remand, Your Honor, and there's an obligation to timely respond to that remand, and that's enforceable through the Court's mandamus authority. So, the Commission wouldn't be able to go along its merry way. It would have to respond to the Court. Thank you, Palmore. I think we understand your position. Thank you. We thank Council for excellent arguments in a complex case, and as requested, we would ask that you make arrangements jointly to get a transcript of the argument prepared and submitted to the Court, and we will take this matter under advisement.